UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROYAL ICE CREAM CO.; and MIDTOWN TRANSPORTATION COMPANY LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,<br><br>Defendant. | No. 23 C 4150<br><br>Judge Thomas M. Durkin |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and CHARLES A. WHOBREY, as Trustee,<br><br>Plaintiffs,<br><br>v.<br><br>ROYAL ICE CREAM CO.; and MIDTOWN TRANSPORTATION COMPANY LLC,<br><br>Defendants. | No. 23 C 4293<br><br>Judge Thomas M. Durkin |

MEMORANDUM OPINION AND ORDER

The parties dispute how much money ERISA requires Royal Ice Cream Co. and Midtown Transportation Company LLC (collectively "Royal") to pay to withdraw from the Central States, Southeast and Southwest Areas Pension Fund ("the Fund"). An arbitrator decided the dispute in Royal's favor, and the Fund argues that the arbitrator used the incorrect method to determine the amount due, based on an incorrect interpretation of the relevant ERISA provisions. The parties have filed cross

motions to either enforce or modify the award. Royal's motion also includes the following two requests to modify the award: (1) require return of any overpayment in a lump sum, rather than credit overpayments against future payments Royal owes to the Fund; and (2) require the Fund to pay Royal's attorneys' fees. The Court denies the Fund's motion to modify, grants Royal's motion to enforce, and denies Royal's motion to modify the award to require a lump sum payment and to include attorney's fees.

## Background

ERISA governs multiemployer pension plans like the Fund. Royal is an employer that contributed to the Fund pursuant to a series of collective bargaining agreements. Royal withdrew from the Fund in 2020. Under ERISA, an employer that withdraws from a pension plan must make a withdrawal liability payment to the plan.

The amount of withdrawal liability is based on the employer's highest contribution rate during the ten years prior to the employer's withdrawal. *See* 29 U.S.C. §§ 1399(c)(i)(I)–(II). However, any rate increase made after 2014 pursuant to a "funding improvement plan" or "rehabilitation plan" is excluded from calculation of withdrawal liability. *See* 29 U.S.C. § 1085(g). "Funding improvement plans" and "rehabilitation plans" are created and implemented by underfunded plans pursuant to various ERISA amendments in order to repair the plan's funding levels.

In this case, the Fund instituted a "rehabilitation plan" in 2008. The rehabilitation plan included a schedule of annual rate increases, some of which

occurred after 2014. The Fund used the rate increases that occurred after 2014 in calculating Royal's withdrawal liability payments. The arbitrator found that this improperly caused Royal to overpay. The arbitrator decreased Royal's withdrawal liability payments accordingly and applied the overpayments that Royal had already made as a credit against the future payments Royal is still required to make. The parties do not dispute the historic rates Royal paid in the past or the method of calculating the withdrawal liability, only which of the historic rates should be used to make the calculation.

## Analysis

I.  **Withdrawal Liability**

Here are the ERISA provisions relevant to whether a post-2014 rate increase should be used to calculate a withdrawal liability:

> (A) Any increase in the contribution rate (or other increase in contribution requirements unless due to increased levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded . . . in determining the highest contribution rate . . . .
>
> (B) For purposes of this paragraph, any increase in the contribution rate (or other increase in contribution requirements) shall be deemed to be required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan except for increases in contribution requirements due to [1] increased levels of work, employment, or periods for which compensation is provided or [2] additional contributions are used to provide an increase in benefits, including an

3

>increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B).

29 U.S.C.A. § 1085(g)(3).

In sum, all post-2014 increases made pursuant to a rehabilitation plan are excluded from calculating a withdrawal liability, with two exceptions. The first exception is for increases in contribution requirements due to "increased levels of work, employment, or periods for which compensation is provided." The parties stipulated that this exception does not apply. *See* R. 23-1.[1]

The second exception applies when "additional contributions are used to provide an increase in benefits, including an increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B)." Subsection (d)(1)(B) applies to funds with "funding-improvement plans," and subsection (f)(1)(B) applies to funds with "rehabilitation plans." Because the Fund here adopted a rehabilitation plan, not a funding-improvement plan, subsection (f)(1)(B) is the only possible relevant exception.

Subsection (f)(1)(B) provides:

>A plan may not be amended after the date of the adoption of a rehabilitation plan under subsection (e) so as to increase benefits, including future benefit accruals, unless the plan actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan, and, after taking into account the benefit increase, the multiemployer plan still is reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan.

---

[1] All docket citations are to 23 C 4150.

In other words, subsection (f)(1)(B) permits a plan to be amended to increase benefits only if "the plan actuary certifies" certain facts about the increase. The Fund does not contend that the post-2014 rate increases at issue in this case were certified by an actuary to meet the requirements of subsection (f)(1)(B).[2]

Instead of arguing that the Fund's post-2014 rate increases satisfy the (f)(1)(B) exception, the Fund argues that subsection (f)(1)(B) does not *prohibit* use of the post-2014 rates increases to calculate the withdrawal liability. The Fund argues that (f)(1)(B) "prohibits only a certain type of benefit/benefit accrual increase," i.e. "an increase pursuant to a rehabiliation plan amendment that is not accompanied by the required actuarial certification." R. 25 at 7. The Fund argues that all other rate increases are *permitted* by subsenction (f)(1)(B), presumably including the rate increases Royal paid to the Fund. But this is simply an incorrect interpretation of (f)(1)(B). That provision prohibits not just a "certain type" of benefit increase. Rather, it prohibits *all* benefit increases *except* for the increases it permits, i.e., those certified by an actuary. And the Fund does not contend that the increases here were certified by an actuary. Therefore, the (f)(1)(B) exception does not apply, and the rate increases should not be included in the withdrawl liability calculation.

Nearly all arbitrator's to have applied subsection (f)(1)(B) have done so in accordance with the Court's interpretation. *See* R. 30 at 8 (citing the decisions). The Fund points to a single arbitrator who adopted the interpretation the Fund proposes

---

[2] At his deposition, the Fund's actuary testified that he never made the required actuarial certification necessary for (f)(1)(B). *See* R. 21-7 at 12.

in this case. But that decision, and another like it, were recently reversed by a court in this district using the statutory interpretation the Court has applied here. *See Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.*, 2024 WL 1363542, at *5 (N.D. Ill. Mar. 29, 2024). There is no viable authority supporting the Fund's interpretation of the statute.

The Fund's interpretation of the statute is simply contrary to its plain lanauge. This is confirmed by the great weight of authority. The arbitrator was correct to find that the Fund improperly used post-2014 rate increases in calculating Royal's withdrawal liability.[3]

## II.  Overpayment

Having established that its withdrawal liability payments have been too high, Royal asks the Court to modify the arbitrator's award to require return of the overpayment in a lump sum, instead of crediting the overpayment against the future monthly withdrawal liability payments Royal is required to make. Because the Fund improperly calculated the withdrawal liability using a higher contribution rate, Royal

---

[3] The Fund makes an "alternative" argument that part of the post-2014 rate increases should be included in the withdrawal liability calculation. *See* R. 25 at 11-15. The Fund concedes that this interpretation is based on a proposed rule promulgated by the Pension Benefit Guaranty Corporation ("PBGC") that was ultimately not adopted. *See* R. 25 at 12-13. The PBGC "is entitled to substantial deference when it construes [ERISA]." *Cent. States, Se. and Sw. Areas Pension Fund v. Nitehawk Express*, 223 F.3d 483, 491 (7th Cir. 2000). But its failure to adopt a rule is due no deference, and in fact suggests that the rejected interpretation should not be followed. So, the Court rejects the Fund's alternative argument. The other court in this district to have addressed this argument, already cited above, also rejected it. *See Event Media, Inc.*, 2024 WL 1363542, at *5.

6

has so far overpaid by $220,110.06. Despite this overpayment, Royal still owes approximately $5 million in future withdrawal liability payments.

The arbitrator ordered the Fund to "credit the [$220.110.06 in] overpayments with interest . . . to all future monthly payments." Royal argues that this was error, and that the arbitrator should have ordered the Fund to return the overpayments in a lump sum. In support of this argument, Royal cites 29 C.F.R. § 4219.31, which provides that if "an arbitrator determines that payments made in accordance with the schedule of payments established by the [fund] have resulted in an overpayment of withdrawal liability, the [fund] shall refund the overpayment, with interest, in a lump sum."

The Fund, however, cites another regulation which permits the arbitrator to adjust the "schedule of payments . . . to reflect overpayments" as an alternative to a lump sum reimbursement. *See* 29 C.F.R. § 4221.8(2) ("The arbitrator shall render a written award that . . . [a]djusts (or provides a method for adjusting) the amount or schedule of payments to be made after the award to reflect overpayments or underpayments made before the award was rendered or requires the plan sponsor to refund overpayments in accordance with § 4219.31(d).").

The Court is not aware of any authority directly addressing this apparent regulatory conflict. Royal cites a number of cases which it argues support its argument that lump sum requirement takes precedence. *See* R. 35 at 8-9 (citing cases). But all of those cases merely cited the regulation requiring a lump sum. One cited the conflicting regulation, but none addressed why the requirement for a lump

7

sum should take precedence or how the regulations should be reconciled. The cases Royal's cites have little relevance here because they failed to address this issue.

Alternatively, Royal relies on the rule of statutory construction that "specific" statutes take precedence over "general" statutes. *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one[.]"). On this basis, Royal argues that the Court should apply the lump sum requirement because it is more "specific." But neither regulation can be characterized as "general." Both regulations address the same specific circumstance—i.e., what to do with an overpayment—and appear to provide different options. Neither is more general or specific than the other.

More relevant here than the rule regarding general and specific statutes, is the "fundamental canon of statutory construction" that a court must "interpret the statute as a symmetrical and coherent regulatory scheme . . . . and fit, if possible, all parts into [a] harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see also Rucker v. Wabash R. Co.*, 418 F.2d 146, 149 (7th Cir. 1969) (regulations are subject to "the same rules of interpretation" as statutes). The Fund points out that a reasonable interpretation of the apparent conflict is that overpayments that exceed the total withdrawal liability amount due must be refunded as a lump sum, whereas overpayments less than the total withdrawal liability may be accounted for as a credit on future payments. *See* R. 31 at 13. Royal waves this argument away and does not explain why it is unreasonable. *See* R. 35 at 8-9. The Court, however, finds it to be meritorious because it serves to

8

reconcile the two regulations as a "harmonious whole," and creates a fundamentally fair outcome. Therefore, the Court will not modify the arbitrator's award to require a lump sum payment.

## III. Fees

Lastly, Royal asks the Court to modify the award to include attorney's fees. Federal regulations provide that the arbitrator "may require a party that initiates or contests an arbitration in bad faith . . . to pay reasonable attorneys' fees of other parties." 29 C.F.R. § 4221.10(c). Royal argues that "where nine out of ten arbitrations to date have rejected the Fund's 'convoluted' and 'wholly unpersuasive' primary argument, the Fund's conduct justifies an award of attorneys' fees." R. 27 at 14.

The Court agrees the Fund's statutory interpretation is wrong. But that does not mean that it is frivolous. And while the weight of the arbitration decisions might have counseled against the Fund expending resources to pursue its argument, arbitration decisions are not binding authority. Interpretation of contested statutory questions must be settled in the federal courts, and there was no such authority on this particular issue when the Fund filed its petition. Therefore, the Court denies Royal's request to modify the arbitration award with an award of attorneys' fees.

9

## Conclusion

Therefore, the Fund's motion to modify [24] is denied. Royal's motion to enforce and modify [26] is granted in part and denied in part. Royal's motion is granted in that the award is enforced and denied in that the Court will not modify the award to require a lump sum payment or attorney's fees.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: May 3, 2024